IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| WILLIAM R. COUCH,<br>    Plaintiff, | ) ) ) | Civil Action No. 7:11-cv-00034 |
| v. | ) ) ) | **MEMORANDUM OPINION** |
| JOHN M. JABE, <u>et al.</u>,<br>    Defendants. | ) ) | By:  Hon. James C. Turk<br>       Senior United States District Judge |

William R. Couch, a Virginia inmate proceeding <u>pro se</u>, filed a civil rights action pursuant to 42 U.S.C. § 1983 with jurisdiction vested in 28 U.S.C. § 1343. Plaintiff names as defendants in both their individual and official capacities: John M. Jabe, the Deputy Director of the Virginia Department of Corrections ("VDOC"); John Garman, a VDOC Regional Director; Daniel A. Braxton, former Warden of the Augusta Correctional Center ("ACC"); Debbie Swisher, the ACC Operations Manager; and R. Ryder, an ACC correctional officer. Plaintiff alleges that defendants violated the First Amendment by initially denying him receipt of three documents. Defendants filed motions for summary judgment, and plaintiff responded, making the matter ripe for disposition. After reviewing the record, the court grants defendants' motions for summary judgment.

I.

A.    OP 803.2

VDOC Operating Procedure ("OP") 803.2 governs plaintiff's ordering and receipt of publications created outside of VDOC facilities.[1] OP 803.2 allows inmates to "subscribe to,

---

[1] Defendant Jabe enacted two nearly identical versions of OP 803.2 that existed during the time involving plaintiff's claims. The first version of OP 803.2 was effective in August 2007 and the second version was effective in November 2010. The August 2007 version relates to the publications <u>Protecting your Health and Safety</u> and <u>The Jailhouse Lawyer's Handbook</u>. The differences between the versions are noted when relevant. OP 803.2 was amended again on November 1, 2011, but that later revision does not apply to plaintiff's claims.

order, and receive publications direct from a legitimate source so long as they do not pose a threat to the security, discipline or good order of the facility and are not detrimental to [inmate] rehabilitation."[2] (OPs 803.2 (Robinson Aff. (no. 43-1) Encl. A, B.) at 2.) OP 803.2 requires inmates to "secure permission from the Facility Unit Head or designee . . . prior to ordering, subscribing to, or otherwise receiving a publication by submitting a Personal Property Request" form, which is only one-page long. A preapproved publication is still inspected for contraband or other policy violations when it arrives at a facility. Approval of one issue of a publication does not constitute blanket approval for subsequent issues or publications from the same vendor. Any publication not ordered or received in accordance with all applicable procedures, including preapproval, will not be delivered to the inmate. The Facility Unit Head gives the inmate a written record why a publication is not allowed under OP 803.2.

B.  PROTECTING YOUR HEALTH AND SAFETY

On January 29, 2009, defendant Ryder received in the ACC mailroom the book Protecting Your Health and Safety, which was distributed by Prison Legal News and addressed to plaintiff. Per OP 803.2, Ryder was not permitted to give plaintiff the book because plaintiff did not obtain preapproval by filing a Personal Property Request form. Staff told plaintiff that the book arrived and gave him two options: plaintiff could allow the VDOC to destroy the book, or plaintiff could fill out the requisite preapproval form and have a visitor retrieve the book within thirty days to mail it back to plaintiff. Plaintiff says he could not obtain approval before the book arrived because the publisher sent the book to him unsolicited and without charge, but

---

[2] OP 803.2 defines "publication" as "as any written communication such as newspapers, magazines, newsletters or other periodicals, books, brochures, catalogs, or pamphlets that can be subscribed to or ordered from a legitimate mail order vendor." A "mail order vendor" is a "publisher, organization, or governmental agency that publishes or distributes publications through the mail or a recognized business/vendor that as a usual and regular business provides mail order service to the public through a mail order catalog or department and normally engages in mail order sales as a substantial part of its business."

2

he opted to have a visitor retrieve the book and mail it to him. The visitor did not arrive within thirty days, and the book was destroyed.

Plaintiff filed a regular grievance about not receiving Protecting Your Health and Safety, requesting that OP 803.2 be revised to allow inmates to receive publications from approved vendors without preapproval. Defendant Braxton found OP 803.2 to be constitutional and determined plaintiff's regular grievance to be unfounded. Defendant Garman upheld Braxton's decision on March 9, 2009.

C.  JAILHOUSE LAWYER'S HANDBOOK

On October 6, 2010, ACC mailroom staff received the book The Jailhouse Lawyer's Handbook, which was published by the Center for Constitutional Rights and addressed to plaintiff. Defendant Swisher notified plaintiff that he could not receive this publication because he did not file a Personal Property Request form for preapproval.

Plaintiff filed a regular grievance on October 8, 2010, requesting the VDOC revise OP 803.2 to allow him to receive publications from authorized vendors without filing a Personal Property Request form for preapproval. On October 19, 2010, the VDOC Director informed VDOC inmates and staff that inmates could receive Prison Legal News' publications if a third party paid for the publication, but inmates still needed to obtain preapproval via a Personal Property Request form to receive the publication. (Pl.'s First Resp. (no. 34) Ex. F.) The VDOC amended OP 803.2 on November 1, 2010, to reflect this new policy. On November 9, 2010, defendant Braxton determined plaintiff's regular grievance to be unfounded because Swisher appropriately prevented plaintiff from receiving The Jailhouse Lawyer's Handbook as he failed to file a Personal Property Request form for preapproval, as required by the previous version of 803.2. After the new policy became effective, however, Swisher gave plaintiff a copy of The

3

Jailhouse Lawyer's Handbook on December 1, 2010, fifty-seven days after the book arrived in the mailroom. Defendant Garman upheld Braxton's grievance response on December 10, 2010, because plaintiff had not obtained preapproval in accordance with the previous version of 803.2.

D.   THE CONTRACT

On January 11, 2010, ACC mailroom staff received a copy of a contract between the VDOC and Chaplain Services of the Churches of Virginia, which a free person mailed to plaintiff. Swisher took the Contract and consulted with Braxton, and they determined that plaintiff could not receive the Contract because it was not a document normally provided to inmates. Plaintiff's subsequent regular grievance was deemed unfounded[3] because the Virginia Freedom of Information Act ("VFOIA") allegedly did not afford an inmate any right to order or possess the Contract, regardless to whether an inmate or a free person initially requested it.[4] Garman upheld this decision on March 30, 2010. ACC staff subsequently consulted with the Office of the Attorney General of Virginia and gave plaintiff a copy of the Contract on June 14, 2011, approximately eighteen months after the Contract arrived at the mailroom and three days before defendants filed their first motion for summary judgment in this action.

---

[3] Braxton did not perform the Level I review of this regular grievance. (Grievances (no. 4-1) at 7.)
[4] The VFOIA reads in pertinent part:
   No provision of this chapter or Chapter 21 (§ 30-178 et seq.) of Title 30 shall be construed to afford any rights to any person incarcerated in a state, local or federal correctional facility, whether or not such facility is (i) located in the Commonwealth or (ii) operated pursuant to the Corrections Private Management Act (§ 53.1-261 et seq.). However, this subsection shall not be construed to prevent an incarcerated person from exercising his constitutionally protected rights, including, but not limited to, his rights to call for evidence in his favor in a criminal prosecution.
VA. CODE § 2.2-3703(C).

4

E.   PLAINTIFF'S CLAIMS AND DEFENDANTS' RESPONSES

Plaintiff argues that no legitimate penological reason existed to prohibit him from receiving the books merely because he did not file a Personal Property Request form for preapproval. Plaintiff also argues that no legitimate penological reason existed to delay his receipt of the Contract because defendants believed a free person obtained the Contract via the VFOIA. Plaintiff speculates that the burden of the preapproval process would require him to wait "several weeks" and spend "several dollars" to communicate with people who want to send him publications. Plaintiff alleges that the initial denials of the two books and the Contract violate the First Amendment right to free speech, and he concludes that he "has suffered injury as a proximate result" of being initially denied these documents. Plaintiff requests declaratory relief; a permanent injunction; and unspecified compensatory, punitive, and nominal damages.

Defendants filed the affidavit of A. Robinson, the VDOC Chief of Corrections Operations, in support of their motions for summary judgment. Robinson acknowledges that inmates have numerous ways of exercising their First Amendment rights, including ordering publications from approved vendors, reading materials from the prison library, and using letters, visitation, and phone calls to communicate with the public. Most inmates also have access to radio and/or television.

Robinson avers that OP 803.2's preapproval requirement for publications minimizes the amount of incoming unauthorized items that inmates order and, thus, reduces the time staff review and handle mail. Facility staff must review all publications before delivering them to inmates, even if an inmate has been authorized to order a publication, because the publication may violate VDOC policies for publications or security. If a previously approved order is disapproved, staff must invest more time and effort to determine whether the inmate still wants a

5

paid but disapproved publication by mailing it out of the facility. Robinson avers that the preapproval requirement reduces the conflict caused when an inmate pays for something that cannot be possessed and reduces the burden on staff to investigate each and every publication that arrives at a facility to determine its origins.

Robinson also avers that the preapproval process helps maintain facility security. Pursuant to VDOC policy, an inmate who does not have preapproval cannot receive the package, and staff does not need to further investigate the legitimacy of the package. Robinson explains that there have been instances when an outside party tries to smuggle contraband by mailing a package that appears to be from a legitimate vendor. Once the deceptive package arrives and staff does not have a preapproval request, staff may dispose of the package without further inquiry.

The VDOC implemented 803.2's preapproval and payment procedures to promote inmates' responsibility and lawful behaviors as part of the rehabilitation process and to reduce orders placed with the intention of defrauding vendors. The preapproval process ensures inmates are not permitted to receive publications of any kind on a trial basis or which have not been prepaid to ensure that a publication is received from an authorized source and the vendor is already paid. Robinson avers that vendors often believe that the VDOC is responsible for ensuring that an inmate's bills are paid simply because an inmate is in the VDOC's custody. Staff is burdened when a vendor attempts to use the VDOC to mediate a business transaction with an inmate.[5] If the vendor secures a judgment against an inmate for an unpaid bill, staff must

---

[5] For example, OP 803.2's security-review process may invalidate a vendor's return or refund policy, and the VDOC assumes no responsibility for any billing issues. The inmate would not receive the publication, the vendor would demand payment, and the inmate would refuse payment on the basis the VDOC confiscated, damaged, or destroyed the publication.

6

process the judgment from the inmate's account, deduct the funds, issue checks, and monitor and deduct funds from the inmate's account until the judgment is satisfied.

## II.

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[6] Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific, admissible facts that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248.

Even if there is no dispute as to the evidentiary facts, summary judgment is not appropriate where the ultimate factual conclusions to be drawn are in dispute. Overstreet v. Ky.

---

[6] The parties received reasonable and explicit notice that the court may convert a motion to dismiss that references matters outside the pleadings into a motion for summary judgment when the Clerk issued a timely Roseboro notice. See Fed. R. Civ. P. 12(d); Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975).

7

Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991). A court may not resolve disputed facts, weigh the evidence, or make determinations of credibility. Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995); Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). A court accepts as true the evidence of the non-moving party and resolves all internal conflicts and inferences in the non-moving party's favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). Furthermore, a party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995). A plaintiff cannot use a response to a motion for summary judgment to correct deficiencies in a complaint challenged by a defendant's motion for summary judgment. See Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009) (noting that a plaintiff may not amend a complaint through argument in a brief opposing summary judgment); Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) (same).

A.  DEFENDANTS ARE IMMUNE FROM DAMAGES.

    1.  <u>Defendants are entitled to qualified immunity in their individual capacities.</u>

Defendants assert that the claims asserted against them in their individual capacities are barred by the doctrine of qualified immunity. Qualified immunity permits "government officials performing discretionary functions . . . [to be] shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity provides immunity from suit rather than a mere defense to liability. Thus, whether a defendant can claim qualified immunity is a pure question of law and is properly determined pretrial. Saucier v. Katz, 533 U.S. 194, 200-01 (2001), overruled on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009) (permitting lower courts the discretion to determine which qualified immunity prong to analyze first).

Once a defendant raises the qualified immunity defense, a plaintiff bears the burden to show that a defendant's conduct violated the plaintiff's right, and the defendant must prove that the right violated was not clearly established at the time of the incident to receive qualified immunity. Henry v. Purnell, 501 F.3d 374, 378 (4th Cir. 2007). "The unlawfulness of the action must be apparent when assessed from the perspective of an objectively reasonable official charged with knowledge of established law." Lopez v. Robinson, 914 F.2d 486, 489 (4th Cir. 1990). See Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent.").

The protections of the First Amendment extend to prison inmates. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987); Morrison v. Garraghty, 239 F.3d 648, 656 (4th Cir. 2001). Nonetheless, an inmate's constitutional rights must be evaluated within the context of incarceration. The Supreme Court has long cautioned that "courts are ill equipped to deal with the increasingly urgent problems of prison administration . . . ." Procunier v. Martinez, 416 U.S. 396, 405 (1974). The court "must accord deference to the officials who run a prison, overseeing

and coordinating its many aspects, including security, discipline, and general administration."

Lovelace v. Lee, 472 F.3d 174, 199 (4th Cir. 2006).

This deference is achieved by a rational basis test. The court considers four factors to determine if prison regulations are reasonably related to legitimate penological interests:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right ... remain open to prison inmates" . . .; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

Id. at 200 (quoting Turner v. Safley, 482 U.S. 78, 89-92 (1987)). A plaintiff bears the ultimate burden of establishing that a prison regulation or decision is unconstitutional. Hause v. Vaught, 993 F.2d 1079, 1082 (4th Cir. 1993). The court must "respect the determinations of prison officials" when applying the Turner factors. United States v. Stotts, 925 F.2d 83, 86 (4th Cir. 1991).

        a.     Protecting your Health and Safety and The Jailhouse Lawyer's Handbook

Plaintiff fails to show that a defendant's conduct involving Protecting your Health and Safety and The Jailhouse Lawyer's Handbook violated the First Amendment, and defendants are entitled to qualified immunity from damages in their individual capacities.[7] Robinson

---

[7] Plaintiff names Garman and Braxton as defendants based on their Level I and Level II grievance responses, respectively, about the two books. An administrator's after-the-fact denial of a grievance is not a sufficient basis to establish that administrator's involvement in the actual deprivation of a constitutional right. See Boger v. Johnson, No. 7:10-cv-00194, 2010 U.S. Dist. LEXIS 132679, at *26, 2010 WL 5174364, at *8 (W.D. Va. Dec. 15, 2010) (citing Brooks v. Beard, 167 F. App'x 923, 925 (3rd Cir. 2006)) (finding that allegations that prison officials and administrators responded inappropriately to inmate's later-filed grievances do not establish the involvement of those officials and administrators in the alleged underlying deprivation), aff'd, 438 F. App'x 167 (4th Cir. 2011). Furthermore, neither Garman nor Braxton authored the challenged policy, and a defendant cannot be held liable in a § 1983 action for a subordinate's act or omission under a theory of respondeat superior. See Monell v. Dep't of Soc.

establishes a valid, rational connection for the August 2007 OP 803.2 requirement that plaintiff needed to file a Personal Property Request form for preapproval to receive <u>Protecting your Health and Safety</u> and <u>The Jailhouse Lawyer's Handbook</u>, and Robinson describes the impact a complete removal of the Personal Property Request form requirement would have on VDOC operations. See <u>Jones v. N.C. Prisoners' Labor Union, Inc.</u>, 433 U.S. 119, 128 (1977) (recognizing courts should give due deference to correctional professionals' determinations of penological objectives). The preapproval policy enhanced institutional security by reducing the amount of staff and time need to handle, screen, and dispose incoming mail. Preapproval via a Personal Property Request form ensured that inmates did not order publications that would clearly constitute disapproved material, which would create additional administrative burdens. As Robinson describes, permitting the alternative of not requiring an inmate to file a Personal Property Request form for publications frustrates vendors and VDOC staff because of inmates' inability or unwillingness to pay for materials prior to receipt, outsiders' attempts to smuggle contraband, and the institutional burdens to process unpredicted and disallowed books from unknown mail order vendors.

Plaintiff could have obtained these books by completing the simple, one-page Personal Property Request form or by having an agent retrieve them.[8] Plaintiff failed to submit a Personal Property Request form for these books, and he does not establish that he will be denied possession of these books if he files a Personal Property Request form. See <u>Mahler v. Slattery</u>, 489 F. Supp. 798, 800 (E.D. Va. 1980) (indicating no First Amendment violation where

---

Servs., 436 U.S. 658, 663 n.7 (1978).
[8] On November 1, 2011, the VDOC again revised OP 803.2 to allow inmates to receive books from a mail order source and paid by friends and family without prior approval if the inmate completes a Personal Property Request form after a book arrives at a facility. (Nov. 2011 OP 803.2 (no. 48-2) at 2-3.) Thus, the revision still requires an inmate to file a Personal Property Request form to receive a book.

11

incoming letters were denied to an inmate because the inmate refused to fill out a consent form). The record is devoid of any evidence that the VDOC foreclosed alternative means of receiving these publications, and plaintiff does not offer obvious, easy alternatives that suggest a completed Personal Property Request form is an exaggerated response.[9]

    b.    The Contract

Mail to inmates may be subjected to reasonable regulation consistent with legitimate policies of internal prison administration and security. See, e.g., Wolff v. McDonnell, 418 U.S. 539 (1974); Burns v. Swenson, 430 F.2d 771 (8th Cir. 1970). The Contract is not a "publication" as defined by OP 803.2, and plaintiff fails to identify or challenge a VDOC policy regulating incoming mail from the public, like the Contract. See Hause, 993 F.2d at 1082 (noting that a plaintiff bears the ultimate burden of establishing that a prison regulation is unconstitutional).

Moving next to consider defendants' acts to deprive plaintiff of the Contract, the court finds that plaintiff fails to establish that any defendant violated the First Amendment by delaying the Contract's delivery. Plaintiff does not have a First Amendment right to obtain government records. See Steeves v. Von Eschenbach, No. 3:07-cv-00011, 2007 U.S. Dist. LEXIS 93079, *7-8, 2007 WL 4553709, *3 (W.D. Va. Dec. 19, 2007) (Moon, J.) ("[T]here is no constitutional right, and specifically no First Amendment right of access to government records.[] As the Supreme Court has explained, '[t]he Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act.'") (quoting Houchins v. KQED, Inc., 438 U.S. 1, 14 (1978) (Burger, C.J., plurality)).

---

[9] For example, Jabe explained in an answer to plaintiff's interrogatory, which plaintiff filed in support of his opposition to defendants' supplemental motion for summary judgment, that an inmate can ask the Librarian of the Department of Correctional Education to make a book available to him through the VDOC's inmate libraries.

12

Defendants intercepted plaintiff's incoming mail of a contract involving the VDOC, which plaintiff does not have a First Amendment right to posses. Prison officials undoubtedly have the right to screen mail entering a correctional facility to prevent the introduction of items that undermine security, good order, discipline, or rehabilitation. See, e.g., Thornburgh v. Abbott, 490 U.S. 401, 415 (1989). It is not difficult to understand the implications to the orderly administration of prisons if inmates are given complete access to the VDOC's contracts: inmates would transform themselves into auditors to supervise the minutia of the VDOC's contractual obligations and would assert their perceived rights as third-party beneficiaries for any deviation from a contractual obligation. See Lewis v. Casey, 518 U.S. 343 (1996) (recognizing inmates do not have a First Amendment right to transform themselves into litigation engines); Thornburgh, 490 U.S. at 409 (recognizing that mail into a prison can reasonably be expected to circulate among inmates with the potential for coordinated disruptive conduct).

Robinson avers that inmates are generally not permitted to access VDOC contracts, but he concludes that the Contract did not present a security risk and should not have been disapproved. Thus, Robinson acknowledges that some contracts may implicate security risks although Swisher and Braxton may have incorrectly withheld the Contract from plaintiff for eighteen months. However, no clearly established federal law recognizes that plaintiff is guaranteed receipt or possession of a state correctional agency's contracts while incarcerated in its facilities, and thus, a defendant's delay of plaintiff receiving the Contract is a result of a "bad guess in a gray area." See VA. CODE § 2.2-3703(C) (stating that the VFOIA should not be construed to give inmates a VFOIA right); Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam) (noting that qualified immunity "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law [or the facts] governing

13

the circumstances she confronted."); Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.").[10]

Plaintiff does not allege that a defendant prevented him from communicating with the public, he ultimately received the Contract during this litigation, and he fails to identify any prejudice from the delay. One incident of delay in delivering plaintiff his mail from a free person does not constitute a denial of a constitutional right, and isolated incidents of mail mishandling do not rise to the level of a constitutional violation. See Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003); Buie v. Jones, 717 F.2d 925, 926 (4th Cir. 1983); Pearson v. Simms, 345 F. Supp. 2d 515, 519-20 (D. Md. 2003), aff'd, 88 F. App'x 639 (4th Cir. 2004) (per curiam) (unpublished). See also Pink v. Lester, 52 F.3d 73, 75-76 (4th Cir. 1995) (recognizing negligent actions that infringe on an inmate's First Amendment rights do not state any constitutionally significant claim). Plaintiff fails to establish any defendant's malicious intent to keep plaintiff from communicating with the public, and his mere conclusions of a "proximate" injury and a defendant's "bad faith" in keeping the Contract from him for eighteen months are insufficient to afford relief. See Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009) (recognizing that labels and conclusions are not entitled to an assumption of truth). Accordingly, defendants are entitled to qualified immunity for plaintiff's Contract claim.

---

[10] Even if plaintiff did have rights under VFOIA, these rights would not be actionable via 42 U.S.C. § 1983 because they do not arise from federal law. The Supreme Court of Virginia has not addressed the question of whether an inmate may use an intermediary to obtain VFOIA documents indirectly, and because the law is not settled on this point, none of the defendants could have violated a clearly established law to the extent that the execution or interpretation of VFOIA implicates a federal right.

14

2. <u>Defendants are immune from damages in their official capacities.</u>

Plaintiff also requests unspecified damages against defendants in their official capacities. The Eleventh Amendment bars suits in federal courts for money damages against an "unconsenting State." <u>Edelman v. Jordan</u>, 415 U.S. 651, 663 (1974). This immunity extends to "arms of the State," including state agencies and state officers acting in their official capacity. <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 280 (1977); <u>Gray v. Laws</u>, 51 F.3d 426, 430 (4th Cir. 1995). Virginia has not waived its sovereign immunity to § 1983 damages actions. Therefore, the Eleventh Amendment bars damages against defendants in their official capacities. <u>Will v. Mich. Dep't of State Police</u>, 491 U.S. 58, 71 (1989).

B. EQUITABLE AND DECLARATORY RELIEF ARE NOT APPROPRIATE REMEDIES.

Plaintiff has already received <u>The Jailhouse Lawyer's Handbook</u> and the Contract, and equitable relief to receive them is now moot. The August 2007 OP 803.2 is no longer effective, and a new OP 803.2, effective March 1, 2011, allows plaintiff to receive publications from Prison Legal News, which publishes <u>Protecting Your Health and Safety</u>; the Center for Constitutional Rights, which publishes <u>The Jailhouse Lawyer's Handbook</u>; and the National Lawyers Guild without prior approval if the inmate files a Personal Property Request form after the publication arrives at a facility. (Pl.'s First Response (no. 34) Ex. C; Robinson Aff. ¶ 12.) Thus, even if plaintiff had not failed to establish a constitutional violation, the court finds that equitable relief is not necessary and declaratory relief is not appropriate. See <u>Pub. Affairs Associates, Inc. v. Rickover</u>, 369 U.S. 111, 112 (1962) (noting that a declaratory judgment is a matter of judicial discretion).

15

## III.

For the foregoing reasons, the court grants defendants' motions for summary judgment, denies plaintiff's motion for summary judgment, and denies as moot plaintiff's motion to rescind the protective order.

The Clerk is directed to send copies of this Memorandum Opinion and the accompanying Order to plaintiff and counsel of record for defendants.

**ENTER**: This 24th day of July, 2012.

*[signature]*
Senior United States District Judge